NO. 4-08-0835          Filed 3/9/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| DEE ANN WALK and MICHAEL HAMMACK, | ) | Appeal from |
| Plaintiffs-Appellants, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE ILLINOIS DEPARTMENT OF CHILDREN | ) | No. 08MR298 |
| AND FAMILY SERVICES and ERWIN McEWEN, | ) | |
| Director, | ) | Honorable |
| Defendants-Appellees. | ) | Leo J. Zappa, Jr., |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

In November 2007, the Illinois Department of Children and Family Services (DCFS) made findings of child abuse or neglect against plaintiffs, Dee Ann Walk and Michael Hammack. Plaintiffs filed administrative appeals. Following an evidentiary hearing, a DCFS administrative law judge (ALJ) found plaintiffs abused or neglected two foster children in their custody pursuant to part 300, appendix B, of Title 89 of the Illinois Administrative Code (89 Ill. Adm. Code §300 app. B, as amended by 25 Ill. Reg. 12781, 12793-94, eff. October 1, 2001) by forcing the children to remain in a closely confined area restricting physical movement. In April 2008, defendant Erwin McEwen, DCFS Director, adopted the ALJ's findings and recommendations and denied plaintiffs' request to expunge the abuse and neglect findings pertaining to close confinement from the State Central Register. In May 2008, plaintiffs filed a complaint for administrative review of DCFS's decision in the Sangamon County circuit court. In September 2008, the court affirmed the Direc-

tor's decision.  Plaintiffs appealed.  For the following reasons, we reverse and remand with directions.

## I. BACKGROUND

In June 2006, DCFS placed four brothers, ranging in age from 6 to 10 years old, with Walk, a licensed foster parent and child-protection investigator employed by DCFS.  Hammack lived with Walk during this time, though the parties dispute whether Hammack was Walk's paramour or "simply a lienholder."  After several months, DCFS removed two of the brothers from the residence at plaintiffs' request due to aggression and behavioral problems.  Anthony M., then nine (born August 7, 1997), and Douglas M., then seven (born April 4, 2000), remained in plaintiffs' home.

Both children were diagnosed with attention deficit hyperactivity disorder (ADHD), oppositional-defiant disorder, and possible posttraumatic stress disorder.  Anthony M.'s behavior was classified as more severe than that of Douglas M., and he was also diagnosed with adjustment disorder and fetal-alcohol effects.  Douglas M. received additional diagnoses involving possible fetal alcohol syndrome and possible reactive-attachment disorder.  According to plaintiffs, both children required extensive supervision due to their tendency to (1) fight with each other; (2) put nonfood items, including tree bark, paper, and animal feces, in their mouths; (3) sneak out of the house at night; (4) urinate throughout the house; (5) mutilate and kill various farm animals present on plaintiffs' property; and (6)

commit acts of vandalism, such as starting a fire in the barn and throwing expensive tools in the swimming pool, the pond, and a nearby field. Plaintiffs estimated the boys caused $60,000 in property damage, due to (1) destruction of the tools; (2) frequent urinating on the furniture and carpet; and (3) harm to plaintiffs' animals, including (a) killing over 300 chickens by stabbing them with nails, (b) injuring 2 horses by stabbing 1 with a stick and poisoning the other with rat poison and antifreeze, and (c) kicking a 20-pound dog to death.

Though plaintiffs purchased baby monitors and installed alarms on the doors and windows of their home, "the young boys defeated these measures by removing batteries from [the monitors] and removing pins from door hinges to reach and turn off [the] door alarms." In June 2007, after the children killed hundreds of plaintiffs' chickens, plaintiffs gave the remaining chickens away and used the chain-link fence panels which once enclosed the penned chickens to build "an outdoor enclosure" containing an eight- by eight-foot sandbox. The record contains conflicting reports as to the size of the enclosure, ranging from 8 by 10 feet to 12 by 18 feet to 16 by 24 feet. All accounts agree the fence was approximately six feet in height. At the evidentiary hearing, Melanie Goss, a DCFS caseworker, testified the enclosure was larger than the 14.5- by 16-foot bedroom the boys shared in plaintiffs' home. The ALJ made no determination of the size of the chain-link enclosure. (One of the photographs of the enclosure from the record before us is appended.)

- 3 -

The parties agree the enclosure had a top made with the same chain-link fence materials as the sides but disagree as to whether the enclosure's gate had a lock. At the evidentiary hearing, Hammack testified the gate held no lock whatsoever. Walk stated the fence had a lock but (1) it was not located on the gate's latch, (2) its key was missing, and (3) it was never used while the boys were inside the enclosure. Bradley Hardick, Walk's nephew, testified he never saw a lock on the enclosure, and Walk's friend, David Leach, testified the lock hung on the fence part of the gate rather than on the latch. Jason Hasquin, a system-of-care coordinator with Rutledge Youth Foundation, and caseworker Goss agreed in their respective testimonies (1) the enclosure had a latched gate with a lock and (2) Walk informed them she needed a "stronger lock" to contain the children within the enclosure. The ALJ made no determination on whether a lock was on the enclosure, it was workable, or it was used when the boys were inside the enclosure.

The parties also disagree as to the main purpose of the enclosure. At the evidentiary hearing, plaintiffs stated the enclosure was meant to keep feral cats and other animals from defecating in the sandbox. However, interview notes taken by DCFS child-protection investigator Jan Johnson state Walk informed Johnson the enclosure had a top to prevent the children from climbing out. Hasquin testified plaintiffs told him the enclosure was "what they use for the kids when [plaintiffs] do their chores." Further, in a July 2007 narrative, plaintiffs

wrote the enclosure served "to ensure that when [they could not] be with the children every second (i.e.[,] if [plaintiffs were] saddling the horses, using the restroom, et cetera)[, the children were] unlikely to do any further damage to animals or property."  The ALJ determined plaintiffs' testimony was not credible and the enclosure's main purpose was to confine the children when plaintiffs were occupied elsewhere.

From the enclosure's construction the week of June 22, 2007, until DCFS caseworkers visited plaintiffs' residence the following week, plaintiffs admitted placing Anthony M. and Douglas M. inside the enclosure on three occasions.  First, the children spent an undisclosed amount of time in the enclosure when Anthony M. requested to go inside the enclosure to play in the sandbox while Walk prepared dinner indoors where she could not see the children and Hammack worked with a horse 15 to 20 feet away from the enclosure.  Next, the children spent approximately 10 minutes inside the enclosure while Walk prepared breakfast and Hammack untied and walked a horse near the barn.  Hammack was at most 55 to 60 feet away from the children during this time.  The third instance occurred when the boys entered the enclosure at Hammack's request, as Hammack was leading one of the horses from the barn to the pasture.  The stallion feared the boys because they had previously stabbed it with a sharpened stick, so Hammack separated Douglas M. and Anthony M. from the animal.  Initially, Hammack did not close the gate.  However, he later did so after Douglas M. ran out of the enclosure and his

- 5 -

proximity caused the horse to "buck, rear up, and land on its back." Once Hammack closed the gate, Anthony M. protested by screaming, "'I'm in prison just like my Dad!'" Hammack testified Douglas M. and Anthony M. spent approximately five minutes inside the enclosure during the incident. The record does not reflect whether the enclosure's gate was locked during any of the three occasions in which the boys were inside.

In addition to the three incidents in which plaintiffs testified the boys spent time in the enclosure, Hardick testified his son played with Douglas M. and Anthony M. inside the enclosure on a separate occasion. Further, Goss testified Walk told her she placed Douglas M. and Anthony M. in the enclosure for 20 minutes or less while plaintiffs showed a visitor the horse stable. In their testimony, plaintiffs denied the events and conversation described by Goss.

On June 27, 2007, Hasquin and Goss met with plaintiffs at plaintiffs' home. During this time, plaintiffs showed Hasquin and Goss the enclosure. Hasquin testified plaintiffs told him they used the "'cage'" to supervise the children when plaintiffs were otherwise occupied. Goss testified the enclosure resembled a large kennel, one which she had never before seen in a child-care or day-care environment. Goss and Hasquin notified DCFS of plaintiffs' use of the enclosure.

On June 30, 2007, DCFS investigator Johnson arrived unannounced at plaintiffs' home. As part of her investigation, Johnson interviewed Anthony M. and Douglas M. Anthony M. told

- 6 -

Johnson plaintiffs "locked" him and his brother in a cage on three occasions because plaintiffs did not trust them. Douglas M. informed Johnson he enjoyed playing in the "cage" with his brother but also stated plaintiffs used a lock to keep him and his brother from getting out. Johnson did not measure the size of the enclosure during her visit. Due to illness, Johnson did not testify at plaintiffs' evidentiary hearing, and DCFS submitted the investigative file she wrote into evidence. The ALJ stated the file received limited weight because plaintiffs were not afforded the opportunity to cross-examine Johnson.

Following Johnson's investigation, DCFS determined plaintiffs abused or neglected Anthony M. and Douglas M. via (1) "tying/close confinement" and (2) inadequate supervision. DCFS then removed the children from plaintiffs' home to a foster home in Springfield.

Plaintiffs appealed both findings, and in February 2008, the ALJ conducted an evidentiary hearing. Following the evidentiary hearing, the ALJ made no determinations on the exact size of the enclosure or whether the latch on the enclosure's gate contained a functional lock. However, the ALJ made a determination the enclosure was designed and used primarily to confine the children when plaintiffs could not closely supervise them. She also repeatedly referred to the enclosure as a "cage." The ALJ noted in her recommendation and opinion the enclosure created a substantial risk of physical harm because (1) photographs of the enclosure do not show any shade or shelter from

sunlight and plaintiffs used the enclosure in mid-summer, (2) the enclosure contained no food or drink, (3) the children could not escape the enclosure at will, (4) the children had a history of fighting violently amongst themselves, and (5) the children were diagnosed with severe emotional and behavioral problems. The ALJ later determined DCFS proved its allegation against plaintiffs regarding close confinement but failed to prove plaintiffs inadequately supervised Anthony M. and Douglas M.

In April 2008, DCFS Director McEwen adopted the ALJ's recommendations and findings, granting plaintiffs' request to expunge the indicated findings of inadequate supervision but denying plaintiffs' request to expunge the close-confinement findings.

In May 2008, plaintiffs filed a complaint in the Sangamon County circuit court for administrative review of the DCFS Director's decision, naming DCFS and Director McEwen as defendants. In their complaint, plaintiffs alleged the abuse and neglect finding based on close confinement was improper because defendants relied upon a DCFS policy guide never promulgated pursuant to the requirements set forth in section 5-40 of the Illinois Administrative Procedure Act (Procedure Act) (5 ILCS 100/5-40 (West 2006)). The court agreed with defendants, finding DCFS properly based its decision on a promulgated DCFS regulation rather than the challenged DCFS policy guide.

This appeal followed.

II. ANALYSIS

On appeal, plaintiffs contend DCFS erroneously found plaintiffs abused or neglected Anthony M. and Douglas M. Specifically, plaintiffs argue (1) DCFS failed to consider whether the enclosure plaintiffs used to contain the children was not physically restrictive of the children's movements; (2) in making its decision, DCFS erroneously relied upon an unpromulgated policy guide in violation of the Procedure Act; and (3) the manifest weight of the evidence does not support a finding the enclosure constituted a cage or was unreasonably confining. For the following reasons, we reverse and remand.

## A. Motion Taken With the Case

As a threshold matter, we first address DCFS's motion to strike portions of plaintiffs' reply brief.

On April 29, 2009, DCFS filed a "Motion to Strike Portions of Reply Brief," which we ordered taken with the case. In its motion, DCFS alleged plaintiffs violated Supreme Court Rule 341(j) (210 Ill. 2d R. 341(j)) by raising issues in their reply brief not addressed in plaintiffs' opening brief. According to DCFS, plaintiffs failed to raise the following issues in their opening brief: (1) DCFS's alleged violation of sections 10-35 and 10-40 of the Procedure Act, (2) DCFS's treatment of Walk given her status as a DCFS employee, and (3) plaintiffs' demand for attorney fees. Further, DCFS moved to strike portions of plaintiffs' reply brief pertaining to plaintiffs' objection to DCFS's inclusion of its own statement of facts in its brief and

- 9 -

plaintiffs' "misstatement of the record" regarding the introduction of the DCFS policy guide in question by witnesses at the evidentiary hearing before the ALJ.

On May 5, 2009, plaintiffs filed a response to DCFS's motion to strike, in which they contend the arguments raised in their reply brief "either relate back to [plaintiffs'] opening brief or were made in response to issues raised in [DCFS's] [o]pening [b]rief." We agree with plaintiffs: portions of both the trial record, plaintiffs' opening brief, and DCFS's brief relate to the above arguments. Further, while we agree with DCFS regarding how standard practice permits appellees to draft their own statement of facts, we find no need to strike plaintiffs' objection to this or plaintiffs' "misstatement" pertaining to which witness discussed the DCFS policy guide in question. See Spangenberg v. Verner, 321 Ill. App. 3d 429, 432, 747 N.E.2d 359, 361 (2001) (refusing to strike a reply brief for nonflagrant violations of supreme court rules). Accordingly, we deny DCFS's motion to strike plaintiffs' reply brief in whole or in part. However, we will disregard any inappropriate statements or arguments made therein.

B. "Close Confinement" Under Allegation of Harm No. 14

Plaintiffs first contend DCFS failed to consider proof of physical restriction as required by the "Allegation of Harm" No. 14 (hereinafter Definition No. 14)--essentially an offense number listed in the administrative rules as an appendix--found in part 300, appendix B, of Title 89 of the Administrative Code

(89 Ill. Adm. Code §300 app. B, as amended by 25 Ill. Reg. 12793-94, eff. October 1, 2001). Specifically, plaintiffs argue Definition No. 14 requires proof beyond the mere classification that an enclosure is in fact a cage; rather, plaintiffs maintain Definition No. 14 requires the size of the enclosure constitute an "unreasonable restriction" of the children's mobility. In response, DCFS argues (1) Definition No. 14 bars placing children inside closely confined areas that unreasonably restrict--but do not totally prohibit--physical movement and thus the size of the area of confinement is not always determinative and (2) placing a child in a "cage" is a per se violation of Definition No. 14 because caging a child is never a reasonable restriction of mobility.

"In administrative cases, we review the decision of the administrative agency, not the determination of the circuit court." Wade v. City of North Chicago Police Pension Board, 226 Ill. 2d 485, 504, 877 N.E.2d 1101, 1112 (2007). Further, interpretation of agency regulations is a question of law, which we review de novo. Perez v. Illinois Department of Children & Family Services, 384 Ill. App. 3d 770, 772, 894 N.E.2d 447, 450 (2008). However, the agency's interpretation of its own rules and regulations "'enjoys a presumption of validity.'" Montalbano v. Department of Children & Family Services, 343 Ill. App. 3d 471, 479, 797 N.E.2d 1078, 1084 (2003), quoting Nolan v. Hillard, 309 Ill. App. 3d 129, 143, 722 N.E.2d 736, 747 (1999).

The case at bar focuses on Definition No. 14. Like all

DCFS rules and regulations, Definition No. 14 has a statutory basis in the Abused and Neglected Child Reporting Act (Child Reporting Act) (325 ILCS 5/1 through 11.7 (West 2006)).  Pursuant to the Child Reporting Act, an "abused child" includes one whose caretaker (1) inflicts or creates a substantial risk of "physical injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function" or (2) "commits or allows to be committed an act or acts of torture upon such child."  325 ILCS 5/3(b), (d) (West 2006).  The Child Reporting Act's definition of "neglected child" includes children who fail to receive "the proper or necessary support or medical or other remedial care recognized under [s]tate law as necessary for a child's well-being, or other care necessary for [their] well-being, including adequate food, clothing[,] and shelter."  325 ILCS 5/3 (West 2006).

Based on these definitions, DCFS promulgated regulations detailing various child-abuse and neglect allegations, essentially defining problematic conduct.  89 Ill. Adm. Code §300 app. B, as amended by 25 Ill. Reg. 12793-94, eff. October 1, 2001.  Definition No. 14, entitled "Tying/Close Confinement," states as follows:

> "<u>Unreasonable</u> <u>restriction</u> <u>of</u> <u>a</u> <u>child's</u>
> <u>mobility,</u> <u>actions,</u> <u>or</u> <u>physical</u> <u>functioning</u> by
> tying the child to a fixed (or heavy) object,
> tying limbs together or <u>forcing</u> <u>the</u> <u>child</u> <u>to</u>

- 12 -

remain in a closely confined area which re-
stricts physical movement. Examples include,
but are not limited to:

-- locking a child in a closet
or small room.

-- tying one or more limbs to
a bed, chair, or other object,
except as authorized by a licensed
physician.

-- tying a child's hand behind
his or her back.

-- putting a child in a cage."
(Emphases added.) 89 Ill. Adm.
Code §300 app. B, as amended by 25
Ill. Reg. 12793-94, eff. October 1,
2001.

The definitional sections do not appear to define "cage."
Plaintiffs contend (1) the plain language of Definition No. 14
"requires proof of a physical restriction of a child's movement"
and (2) putting a child in a cage and locking a child in a small
room "are only examples" and not per se violations of unreason-
ably restricting a child's mobility. DCFS does not dispute
Definition No. 14 requires proof a child was physically re-
strained but emphasizes Definition No. 14's plain language does
not require (1) a cage be locked or a certain size or (2) a
complete restriction of a child's mobility. DCFS further main-

- 13 -

tains a cage always constitutes an unreasonable restriction of a child's physical mobility regardless of its size and, thus, placing a child in a cage is a per se violation of Definition No. 14.

While we do not advocate caging children, affirmance does not logically follow. DCFS's position in essence elevates the undefined example over the definition itself. Casting a space as a cage does not relieve DCFS of its burden to determine whether the use of the space on the facts fulfills the definition of harm stated in Definition No. 14. As a result, we do not address the ALJ's finding the enclosure is a "cage."

As with matters of statutory interpretation, "our primary objective is to ascertain and give effect to the drafters' intent." Perez, 384 Ill. App. 3d at 772, 894 N.E.2d at 450. In doing so, we examine the regulation's language and give it its plain and ordinary meaning. Perez, 384 Ill. App. 3d at 772-73, 894 N.E.2d at 450. Moreover, a court "must construe the statute so that each word, clause, and sentence is given a reasonable meaning and not rendered superfluous, avoiding an interpretation that would render any portion of the statute meaningless or void." Cassens Transport Co. v. Illinois Industrial Comm'n, 218 Ill. 2d 519, 524, 844 N.E.2d 414, 419 (2006).

While we agree the plain language of Definition No. 14 does not require complete immobility for a finding of close confinement, we find DCFS's interpretation of confinement via cages as per se unreasonable is overly broad. Courts have

- 14 -

traditionally decided matters involving abuse and neglect of children on a case-by-case basis. See In re M.Z., 294 Ill. App. 3d 581, 593, 691 N.E.2d 35, 43 (1998). Particularly, courts have determined each case hinges on its own particular set of facts because abuse and neglect findings rely on "'amorphous concept[s] which cannot be defined with particularity.'" In re Edricka C., 276 Ill. App. 3d 18, 26, 657 N.E.2d 78, 83 (1995), quoting In re B.M., 248 Ill. App. 3d 76, 79, 618 N.E.2d 374, 376 (1993).

We decline to hold the language of Definition No. 14 bars placing children in a confined area in every possible circumstance. Definition No. 14 bars the "unreasonable restriction of a child's mobility, actions, or physical functioning" by, inter alia, "placing the child in a cage." (Emphasis added.) 89 Ill. Adm. Code §300 app. B, as amended by 25 Ill. Reg. 12793-94, eff. October 1, 2001. While "caging" children is certainly not to be tolerated under most circumstances, an unforeseen emergency may arise in which use of an enclosure would be warranted and entirely reasonable. For example, if a small child is playing in the yard when a rabid dog suddenly approaches, the child's caregiver may have no other option for the child's safety but to quickly place the child in a nearby dog kennel to keep the child out of immediate danger. Is this unreasonable? Is it statutory abuse or neglect? Therefore, because limited circumstances may arise where caging may aid in the safety of children, we disagree with DCFS's assertion caging is a per se unreasonable restriction of a child's mobility, actions, or physical functioning for

- 15 -

purposes of Definition No. 14.  Rather, we find the relevant inquiry is as follows: do the circumstances of the case render the confinement unreasonable?

Definition No. 14 requires a degree of consideration of an enclosure's size in determining either whether the confining structure is a cage or where the confinement pertains to closets, rooms, or other areas or structures, but size alone cannot determine whether confinement is unreasonable.  Definition No. 14's plain language states unreasonable close confinement <u>restricts</u>--not prohibits--physical mobility.  It further lists cages and small, locked rooms as examples of closely confining areas that may be deemed to unreasonably restrict a child's mobility, actions, or physical functioning.  As previously stated, unreasonable restriction via confinement must be decided on a case-by-case basis.  Locking a child in a closet may be a more unreasonable restriction of movement than placing a child in a crib, even though the closet may allow a child a wider range of mobility than the crib.  Therefore, while cages and small, locked rooms undoubtedly allow children varying degrees of mobility, this does not automatically indicate whether confining children in these structures is reasonable.  Rather, the circumstances of the confinement as a whole, including but not solely limited to the size of the confining structure, must determine the reasonableness of the confinement.

Plaintiffs argue the enclosure used to confine Anthony M. and Douglas M. is too large to constitute a closely confining

structure. Plaintiffs further contend categorizing their enclosure as closely confining would render Definition No. 14's plain language meaningless, allowing any enclosure, such as a fenced-in backyard, to constitute close confinement. As discussed below, we find plaintiff's structure was not unreasonably closely confining under Definition No. 14. However, while children may have limited space to walk or even run back and forth while forced to remain in an enclosure, this alone does not determine whether their confinement inside it was reasonable. Again, we note findings of abuse or neglect under Definition No. 14 are decided on a case-by-case basis and require consideration of the enclosure's size in addition to other factors, such as the duration in which children are confined and the nature of or reasoning for the confinement.

DCFS's interpretation of its own rule receives some deference. See Montalbano, 343 Ill. App. 3d at 479, 797 N.E.2d at 1084. While DCFS is incorrect caging is per se unreasonable, we agree cages or enclosures allowing limited movement can constitute closely confining structures under Definition No. 14. Further, we note, pursuant to Definition No. 14's plain language, the reasonableness of the restriction of mobility, physical movement, and the actions of confined children is determinative as to whether unreasonable close confinement has occurred, and while size is one factor used to assess reasonableness, it alone cannot be the deciding factor.

C. DCFS's Reliance on Policy Guide 2000.14

Plaintiffs next argue the ALJ and the DCFS Director improperly based their decisions on Policy Guide 2000.14, which DCFS failed to properly promulgate in accordance with the Procedure Act. DCFS responds the policy guide "merely implements [DCFS's existing] policy regarding close confinement" and does not constitute an independent rule.

The Procedure Act requires all agency rules be promulgated, i.e., made available for public inspection and filed with the Secretary of State. 5 ILCS 100/5-10 (West 2006). Rules not properly promulgated are invalid, not effective against any person or entity, and "'may not be invoked by an administrative agency for any purpose.' [Citation.]" Champaign-Urbana Public Health District v. Illinois Labor Relations Board, State Panel, 354 Ill. App. 3d 482, 488, 821 N.E.2d 691, 696 (2004).

An agency "rule" is defined as an agency statement of general applicability "that implements, applies, interprets, or prescribes law or policy." 5 ILCS 100/1-70 (West 2006). Pursuant to the Procedure Act, a "rule" does not include the following:

"(i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency, (ii) informal advisory rulings issued under [s]ection 5-150, (iii) intra-agency memo-

- 18 -

randa, (iv) the prescription of standardized forms, or (v) documents prepared or filed or actions taken by the Legislative Reference Bureau under [s]ection 5.04 of the Legislative Reference Bureau Act."  5 ILCS 100/1-70 (West 2006).

In the case at bar, both the ALJ and Director McEwen repeatedly referenced Policy Guide 2000.14 in their respective decisions.  In October 2000, DCFS circulated Policy Guide 2000.14 to its child-welfare staff in response to a newspaper article accusing the agency of permitting the caging of children.  The guide cited Definition No. 14's definition of "close confinement" and listed the procedure for taking a report in response to situations involving tying or close confinement.  Regarding the investigation of confinement cases, the guide instructs DCFS employees, in pertinent part, as follows:

"For confinement cases, a detailed description of the confining space and the circumstances surrounding the confinement must be included in the investigation file[,] including: (1) the size of the space, (2) access to help/assistance, (3) heat/ventilation present, (4) duration and frequency of confinement, (5) presence or absence of lighting, [and] (6) reason for confinement."

In relation to referral incidents of caged children to law

enforcement, the guide further states:

> "A parent, or other person responsible for
> the child's care, who forces their child to
> remain in a cage of any size while denying
> the child [(1)] use of bathroom facilities
> and/or [(2)] food and/or water commits an act
> of neglect, cruelty[,] and depravity which
> should be referred to law enforcement for
> investigation."

Under the heading "Purpose," the guide states, "[DCFS] has never approved the caging of children and does find the act abusive, cruel[,] and neglectful."

Interpretation of agency regulations is a matter of law, which we review de novo. Perez, 384 Ill. App. 3d at 772, 894 N.E.2d at 450. We find Policy Guide 2000.14 does not constitute a rule for purposes of section 1-70 of the Procedure Act. Rather, the guide merely alerts its employees of the existing rule set forth in part 300, appendix B, of Title 89 of the Administrative Code regarding close confinement and instructs them how to document and assess confinement cases pursuant to the definition of "close confinement" found in Definition No. 14.

While the guide states "DCFS has never approved of the caging of children," it goes on to specify when placing a child in a "cage" constitutes unreasonable close confinement, i.e., "placing a child in a cage of any size while denying the child use of bathroom facilities and/or food and/or water commits an

- 20 -

act of neglect, cruelty [,] and depravity which should be referred to law enforcement for investigation." This language does not indicate every instance of placing a child in a "cage" equates abuse and neglect. These criteria merely specify for DCFS caseworkers how to determine when restriction of children's mobility, actions, or physical functioning may be unreasonable and when the incident should be referred to law enforcement for investigation.

Policy Guide 2000.14 does not expand the circumstances in which DCFS determines abuse or neglect based on close confinement. Cf. Kaufman Grain Co. v. Director of the Department of Agriculture, 179 Ill. App. 3d 1040, 1044, 534 N.E.2d 1259, 1262 (1988) (finding a rule unpromulgated because it extended the Department of Agriculture's authority to adjudicate disputes regarding the quality of grain). Moreover, the guide does not alter private rights or procedures available to plaintiffs because Definition No. 14 plainly states caging, like locking a child in a small room, constitutes close confinement only when unreasonable. Therefore, we do not find Policy Guide 2000.14 constitutes a rule requiring promulgation pursuant to the Procedure Act.

DCFS also alleges Walk had specific knowledge of Policy Guide 2000.14 due to her employment as a DCFS caseworker. However, because we find Policy Guide 2000.14 is not a rule, we need not address the parties' dispute regarding Walk's knowledge of Policy Guide 2000.14 via her employment with DCFS.

### D. The Director's Findings Plaintiffs' Enclosure Was Unreasonably Confining

Finally, plaintiffs contend the Director's determination the enclosure constituted a cage was clearly erroneous and its underlying findings of fact were against the manifest weight of the evidence. Above, we found Definition No. 14 does not per se bar placing children in cage-like structures. Thus, the relevant inquiry is not whether plaintiffs' structure is a cage but, rather, whether placing children inside the structure constituted unreasonable close confinement.

Review of purely factual findings made by an administrative agency is conducted under a manifest-weight-of-the-evidence standard. MJ Ontario, Inc. v. Daley, 371 Ill. App. 3d 140, 145, 861 N.E.2d 1161, 1166 (2007). Under such review, a reviewing court may not substitute its own judgment for that of the agency, nor does it reweigh the evidence or make an independent determination of the facts; instead, it should inquire whether the opposite conclusion is clearly evident. MJ Ontario, 371 Ill. App. 3d at 145, 861 N.E.2d at 1166. "However, the 'mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently' does not justify reversal of the agency's decision." MJ Ontario, 371 Ill. App. 3d at 145, 861 N.E.2d at 1166, quoting Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992). "If there is evidence in the record supporting the administrative agency's decision, it should be affirmed." MJ Ontario, 371 Ill. App. 3d at 145, 861 N.E.2d at

1166.

Moreover, the legal effect of a given set of facts poses a mixed question of law and fact. See Perez, 384 Ill. App. 3d at 775, 894 N.E.2d at 452. A reviewing court reverses a finding as to a mixed question only where it is clearly erroneous (Marconi v. Chicago Heights Police Pension Board, 225 Ill. 2d 497, 532, 870 N.E.2d 273, 293 (2006)), i.e., where the court is firmly convinced a mistake has been committed. AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001). Thus, we review the ALJ's underlying findings of fact under the manifest-weight-of-the-evidence standard and the mixed question of law and fact pertaining to whether plaintiffs' structure constitutes unreasonable close confinement under the clearly-erroneous standard.

The Director upheld the following factual findings made by the ALJ: (1) Anthony M. and Douglas M. "have serious mental [-]health and behavioral problems and it would be difficult for any adult to parent these children on a full-time basis; (2) Walk's employment with DCFS and experience as a foster-care parent provided her with "unique wisdom regarding how to care for and understand difficult children"; (3) plaintiffs constructed a "metal enclosure" using chain-link panels and a "swinging metal gate door"; (4) the appearance of plaintiffs' structure "can best be described as large metal dog kennel"; (5) plaintiffs used the enclosure at least three times, one of which caused Anthony M. to grow upset and scream, "'I'm in prison like my dad!'"; (6)

- 23 -

plaintiffs built the structure primarily to contain the children while plaintiffs were occupied elsewhere; (7) caseworker Goss credibly testified concerning Walk's discussion of needing a "stronger lock" for the enclosure and leaving the children inside for 20 minutes while visitors were on the property; (8) two other child-welfare professionals confirmed the existence and appearance of the enclosure on plaintiffs' property; and (9) at seven and nine years old, Anthony M. and Douglas M. "were old enough to understand that they were being placed in a structure typically used to confine and restrict the movement of animals."

While we find none of the above factual findings were against the manifest weight of the evidence, we disagree with the ALJ and the Director as to whether those facts indicate plaintiffs' structure was unreasonably confining. The evidence establishes plaintiffs confined the children within the structure on several occasions. However, it does not show the confinement was unreasonable.

Imperative to our finding plaintiffs did not act unreasonably is the fact the Director upheld the ALJ's finding plaintiffs adequately supervised the children. Rather than find plaintiffs left the children unattended for extended periods of time, the ALJ noted as follows:

> "The evidence has established that [Anthony
> M. and Douglas M.] were placed in a cage
> while at least one of the [plaintiffs] was
> outside either in the barn or upon the prop-

- 24 -

erty. [DCFS's] witnesses and exhibits have not presented sufficient evidence to establish exactly what distance from the cage the [plaintiffs] were while the children were in the cage. There was some evidence presented that while the children were in the cage and [Hammack] was working, he would check on them from time to time. *** Because of the poor quality of the investigation conducted in this case, there is not enough evidence that one of the [plaintiffs] could not have heard a problem between the children and immediately respond[ed,] thereby protecting the children from harm."

Correspondingly, nothing in the record suggests plaintiffs left the children in the structure for an extended period of time during which plaintiffs denied them food or water or use of bathroom facilities. For this very reason, we disagree with the ALJ and Director's determination the structure was unreasonably closely confining. To the contrary, testimony from Walk and Hammack shows they used the enclosure on several occasions, in brief intervals, to protect the children. Hammack testified he confined the children on one occasion to keep them from approaching a horse after Anthony M. ran at the animal, causing it to buck up on its hind legs and pose a safety risk. Hammack also admitted he placed the children inside the enclosure on two other

occasions, again when he was working with the horses. Walk testified the children constantly engaged in reckless behavior, such as sneaking out of the house at night, killing various animals present on the property, and attempting to burn down the barn. The evidence supports an inference plaintiffs briefly used the structure to protect the children while plaintiffs did chores nearby, not as a means of imprisonment or punishment.

Moreover, although one of the DCFS caseworkers likened the structure to a "dog kennel," this is not accurate. The structure contained toys and a sandbox. The chain-link material comprising the structure's walls (and top) is often used to fence in backyards, and fences frequently have latches or locks on gates, often above the reach of children. to prevent them from running out of yards and into the street. Further, the structure was large enough for the children to run in, as evidenced by the trampled grass on the ground inside, and, according to caseworker Goss, its size exceeded the spacial dimensions of the children's bedroom. DCFS argues "[a] child's bedroom is primarily [used] for sleeping[] and is also used for sedentary activities like homework and board games. It is not meant to be a place where children walk and run[] and thus would not need to be large enough to accommodate such activities." However, unreasonable close confinement does not occur simply because children lack vast space outside to walk and run. If this were the case, allowing children to play in a small, fenced-in backyard would constitute abuse and neglect under Definition No. 14.

Given the specific circumstances of this case--namely, the children's severe behavioral problems--we find plaintiffs did not engage in unreasonable close confinement by placing Anthony M. and Douglas M in a structure for short periods of time to protect them from harming themselves. DCFS presented no evidence supporting unreasonableness; plaintiffs adequately supervised the children, and the record does not show the structure itself was closely confining. Thus, the circuit court erred when it upheld the ALJ and Director's finding of unreasonable close confinement under Definition No. 14.

## III. CONCLUSION

For the reasons set forth above, we reverse the circuit court's decision and the agency decision and remand as to the issue of attorney fees.

Reversed and remanded with directions.

APPLETON and POPE, JJ., concur.