# Illinois Official Reports

## Appellate Court

---

### *Johnson v. O'Connor*, 2018 IL App (1st) 171930

---

| | |
|---|---|
| Appellate Court Caption | EDDIE JOHNSON, in His Official Capacity as Superintendent of the City of Chicago Police Department, and THE CITY OF CHICAGO, Petitioners-Appellees, v. EDWARD O'CONNOR and THE HUMAN RESOURCES BOARD OF THE CITY OF CHICAGO, Respondents (Edward O'Connor, Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-17-1930 |
| Filed | September 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-120003; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed and remanded with directions. |
| Counsel on Appeal | Christopher Cooper, of Law Office of Christopher Cooper, Inc., of Chicago, for appellant.<br><br>Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Julian N. Henriques Jr., Assistant Corporation Counsel, of counsel), for appellees. |

Panel      PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Hoffman[*] and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1  Respondent-appellant Edward O'Connor was removed from a list of eligible candidates for a position as a Chicago police officer based on his admission that he had twice been arrested for domestic battery in 2003 and 2014. Following a hearing on his removal, he was reinstated to the eligibility list by respondent Human Resources Board of the City of Chicago (Board). Petitioners-appellees Eddie Johnson, the Chicago Police Department (CPD) superintendent, and the City of Chicago (petitioners) petitioned for a common law writ of *certiorari* in the circuit court to review the Board's decision. The court reversed the decision of the Board, and O'Connor appeals. For the reasons that follow, we affirm and remand with directions.

¶ 2               BACKGROUND

¶ 3  In 2014, O'Connor applied for a position as a probationary police officer with the CPD. Part of the application process required completing a personal history questionnaire, in which O'Connor admitted that he had been arrested for domestic battery against his mother in 2003, when he was 18, and against his roommate and ex-girlfriend in 2014.

¶ 4  O'Connor wrote that in 2003 he was living with his mother, a retired police officer. One morning, his mother woke him up and asked him to do chores, but he said no because he had to leave for work and told her he would do them when he returned. According to O'Connor, his mother yelled at him, and he repeated his refusal to do the chores and slammed the door in her face, whereupon his mother had him arrested for domestic violence. O'Connor's narrative with regard to the 2014 incident indicated that his roommate "became enraged" after he declined to take her to the grocery store and threatened to ruin his life by hitting herself and telling the police that he did it. O'Connor laughed and walked away, and his roommate then called the police saying O'Connor hit her, when in fact she hit herself with an object she found next to the parking lot of O'Connor's apartment. The police arrived and arrested O'Connor, disbelieving his claim that his roommate injured herself.

¶ 5  An administrative special order (Special Order) by the CPD provides that "[a]ny conduct demonstrating a propensity for violence may be grounds for disqualification." Such conduct includes battery and domestic violence. Based on this Special Order, and following a background investigation in which the CPD obtained police reports of the arrests, Investigator Stanley Golucki recommended that O'Connor be disqualified for the position of police officer. The CPD accepted the recommendation and advised the Department of Human Resources (DHR) to remove O'Connor from the list of eligible candidates.

¶ 6  On June 26, 2015, DHR notified O'Connor of his removal from the list but informed him that he could challenge the removal by requesting a hearing with the Board, which he did. At

---

[*]Justice Hoffman, justice of the Sixth Division, was designated as the third panel member following recusals by other members of the Second Division.

the hearing, which was held on December 16, 2015, Golucki, O'Connor, O'Connor's mother, Karen O'Connor, and O'Connor's girlfriend, Tanya Dovichi, all testified. Golucki testified to the contents of the arrest report of the 2003 incident, which was also made part of the record.[1] The 2003 arrest report indicated that when police arrived at Karen's house, she told them that she and O'Connor engaged in a verbal dispute after she asked him for help around the house. O'Connor grabbed Karen by the neck and threw her to the kitchen floor, causing her injury. Karen declined treatment and to have photos taken of her neck, which the report described as "reddened." O'Connor "freely stated" that he "didn't grab [Karen] that hard." The officers took O'Connor into custody and advised Karen of the upcoming court date. O'Connor was charged with domestic battery, but the charge was ultimately stricken with leave to reinstate.

¶ 7 Karen testified that one morning when O'Connor was about 17 or 18 years old and living with her, she woke him up to ask for his help in moving something. When O'Connor did not get out of bed, Karen took his car keys and told him to walk to work. This prompted O'Connor to get out of bed and follow Karen to the kitchen, where he grabbed the keys out of Karen's hand. During the struggle with the keys, Karen slipped and fell. She denied that O'Connor threw her to the floor or that he choked her. Karen testified that she called the police to "teach [O'Connor] a lesson" not to put his hands on her. On cross-examination, Karen testified that she was surprised the police report indicated that O'Connor grabbed her by the neck and threw her to the floor. She was also surprised that the report described her as having a reddened neck.

¶ 8 In his testimony, O'Connor agreed with his mother's description of the 2003 incident. He clarified that when he went to the kitchen to retrieve the keys, his mother had her back to him and was holding the keys in her fist, but the lanyard attached to the key ring was free. O'Connor approached Karen from behind and grabbed the lanyard to pull the keys from her hands. According to O'Connor, Karen then bumped him and he started to fall backwards while still holding the lanyard, which caused Karen to fall down. O'Connor denied choking Karen, throwing her to the ground, or punching her. He testified that he learned a lesson, and the charges were dismissed.

¶ 9 The hearing officer's report found that it was more likely than not that O'Connor engaged in domestic battery against his mother in 2003, but that it was *not* more likely than not that O'Connor committed domestic battery in 2014. The hearing officer concluded that although "one instance of domestic battery was shown more likely than not, it occurred 13 years ago when [O'Connor] was a teen; once [*sic*] instance alone does not show a propensity." Accordingly, the hearing officer recommended to the Board that the decision of the CPD be reversed and O'Connor's name be returned to the eligibility list.

¶ 10 In July 2016, the Board adopted the hearing officer's findings and recommendations in their entirety and reinstated O'Connor to the eligibility list.

¶ 11 Johnson petitioned the circuit court for a common law writ of *certiorari*. Following briefing and oral argument, the court reversed the decision of the Board holding that the hearing officer's conclusion that a single violent incident is insufficient to demonstrate a propensity for violence was inconsistent with the language of the Special Order. O'Connor

---

[1]At the hearing, evidence was also introduced regarding the 2014 incident, but because the hearing officer found that it was *not* more likely than not that O'Connor committed domestic battery in 2014, and because that finding is not challenged on appeal, we find it unnecessary to recount that evidence here.

timely appeals.

¶ 13     At issue in this case is the Board's decision to reinstate O'Connor to the eligibility list notwithstanding that he more likely than not committed domestic battery against his mother in 2003. The parties do not dispute that the circuit court properly reviewed the Board's decision pursuant to a common law writ of *certiorari*, given that the act conferring power on the Board does not expressly adopt the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) and does not provide for another form of review. See *Applegate v. Department of Transportation*, 335 Ill. App. 3d 1056, 1061 (2002). Our review of a writ of *certiorari* is "essentially the same" as our review of a petition filed under the Administrative Review Law. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 337 (2009). In either case, we review the decision of the agency rather than the circuit court under our "traditional standards of review of administrative decisions." *Porter v. Illinois State Board of Education*, 2014 IL App (1st) 122891, ¶ 25.

¶ 14     The applicable standard of review of the agency decision depends on the question presented on appeal. *Id.* ¶ 26. If the question is one of fact, we apply a manifest weight of the evidence standard, while if the question is one of law, we review the decision *de novo*. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. And if the appeal presents a mixed question of law and fact, it is subject to review under the deferential "clearly erroneous" standard. *Id.* Here, O'Connor urges us to apply a clearly erroneous standard to what he contends was a mixed question of law and fact, while Johnson maintains that our review is *de novo*, arguing the issue on appeal is solely a question of law.

¶ 15     At the outset, we note that O'Connor did not advocate for application of the clearly erroneous standard in the circuit court and instead argued that the Board's decision was subject to review under a manifest weight of the evidence standard as it was "a question of fact and fact alone." As Johnson points out, a party waives any argument he fails to present in circuit court. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413 (2002). But because waiver is a limitation on the parties and not the court (*Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 11 (1996)), we nevertheless address the merits of the parties' dispute regarding the standard of review.

¶ 16     A mixed question of law and fact examines "the legal effect of a given set of facts" or, stated differently, whether uncontested facts satisfy the statutory standard. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005). O'Connor contends that the issue on appeal is whether the uncontested facts of his 2003 arrest implicate the Special Order so as to justify his disqualification. But that determination turns, in the first instance, on the interpretation of the Special Order, which is a question of law. See *Burris v. Department of Children & Family Services*, 2011 IL App (1st) 101364, ¶ 30 (interpretation of agency regulation is a question of law). And as discussed *supra* ¶ 14, we review an agency's decision on questions of law *de novo*. See *Beggs*, 2016 IL 120236, ¶ 50. Importantly, however, an agency's interpretation of its own rules and regulations " 'enjoys a presumption of validity.' " (Internal quotation marks omitted.) *Burris*, 2011 IL App (1st) 101364, ¶ 30 (quoting *Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1181 (2010)).

¶ 17    We construe administrative regulations according to the same standards governing the construction of statutes. *People v. Bonutti*, 212 Ill. 2d 182, 188 (2004). The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 16. The most reliable indicator of the legislative intent is the plain language of the statute, which must be given its ordinary meaning. *Id.* Where the language is clear and unambiguous, we may not depart from that language by reading into the statute exceptions, limitations, or conditions that the legislature did not express. *Id.* With these principles in mind, we turn to an examination of the Special Order.

¶ 18    The Special Order at issue is titled "Pre-Employment Disqualification Standards for Applicants for the Position of Police Officer," and the relevant subsection of the Special Order is titled "Disqualification Based on Criminal Conduct." Prior to listing the types of criminal conduct that disqualify a candidate, there is a disclaimer which reads: "The Standards are as comprehensive as possible, however as noted above, they cannot encompass every possible scenario. *** Commission of any criminal or quasi-criminal act may result in disqualification from employment as a Police Officer if it is determined that the acts or omissions of the applicant make him or her unsuitable for the position of Police Officer." Here, O'Connor was disqualified based on subsection (B)(2)(c) of the Special Order, which reads:

> "*Conduct Indicating Violent Tendencies.* Any conduct demonstrating a propensity for violence may be grounds for disqualification. Conduct demonstrating a propensity for violence includes but is not limited to, conduct which would constitute *** battery *** [and] domestic violence ***. As noted above, an applicant who has engaged in any act falling within the scope of this section that constitutes a felony will be found unsuitable for employment. An applicant who has engaged in any act falling within the scope of this section that constitutes a misdemeanor within the last three (3) years (from the date of [personal history questionnaire] submission) or more than one (1) time in his or her life, will be found unsuitable for employment."

¶ 19    The plain language of subsection (B)(2)(c) of the Special Order defines both when disqualification is discretionary as well as when it is mandatory. The first sentence of the order provides that an applicant *may* be disqualified for *any* conduct demonstrating a propensity for violence. The word "may" indicates that the decision to disqualify a candidate for conduct demonstrating a propensity for violence is within the CPD's discretion. See *People v. Garstecki*, 234 Ill. 2d 430, 443 (2009) (statute's use of the word "may" indicates that a rule is permissive). This is particularly true when we consider that the remaining sentences of the order specify the circumstances under which an applicant *will* be "found unsuitable for employment," *i.e.*, if the act charged constitutes a felony or if it was a misdemeanor committed (i) within the past 3 years or (ii) more than once in an applicant's life. See *Hoffman v. Altamore*, 352 Ill. App. 3d 246, 256 (2004) ("[W]hen the legislature uses certain words in one instance and different words in another, different results are intended.").

¶ 20    Our conclusion finds additional support in the fact that the Special Order expressly states that the standards for disqualification based on criminal conduct "cannot encompass every scenario" and provides generally that disqualification may be based on the commission of "any criminal or quasi-criminal act" where the act makes the applicant "unsuitable for the position of police officer." This language suggests that the Special Order is intended to invest broad discretion in the CPD in disqualifying candidates. For these reasons, we conclude that the

Board's interpretation was contrary to both the Special Order's plain language and well-settled principles of statutory construction.

¶ 21 When the Board concluded as a matter of law that one instance of violence constituting a misdemeanor committed more than three years before the candidate's submission of his personal history questionnaire is *per se* insufficient to warrant disqualification, it prohibited CPD from exercising its discretion. Certainly, there are situations where, in CPD's discretion, it could determine that a single misdemeanor act of domestic violence disqualifies a candidate from eligibility for employment. By way of example, if the battery was committed against a candidate's pregnant wife with other small children present, CPD could determine that those "aggravating" circumstances render the candidate ineligible no matter when the conduct occurred.

¶ 22 Having determined that the Board erred in its interpretation of the Special Order, we turn to the proper remedy. We cannot merely remand with directions for the Board to remove O'Connor's name from the eligibility list, as the CPD's initial decision to disqualify O'Connor was based on both the 2003 and 2014 incidents, and the hearing officer determined that it was *not* more likely than not that the incident in 2014 in fact occurred. Given that O'Connor's disqualification was based on two incidents of domestic battery, CPD was not given the opportunity to consider whether the circumstances of the first incident warranted disqualification. Therefore, the appropriate course is to allow the CPD to exercise its discretion to determine if the 2003 incident alone disqualifies O'Connor. In making this determination, the CPD may consider the fact that, while O'Connor disclosed the incident in his personal history questionnaire, his description of slamming the door in his mother's face, which he included in the questionnaire, was at odds with (i) the police report, which indicated that O'Connor grabbed his mother's neck and threw her to the floor and told police he "didn't grab her that hard," and (ii) his testimony at the hearing.

¶ 23 CONCLUSION

¶ 24 For the foregoing reasons, we affirm the decision of the circuit court and remand to the circuit court with directions to remand to the Board with the further direction to remand to the CPD to determine whether the single incident of conduct constituting domestic violence engaged in by O'Connor is grounds for discretionary disqualification.

¶ 25 Affirmed and remanded with directions.