2022 IL App (1st) 221109

No. 1-22-1109

Second Division
December 20, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.R., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 20 JA 783 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| L.O., | ) | John Huff and |
| | ) | Honorable Tiesha Smith |
| Respondent-Appellant). | ) | Judges, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

**OPINION**

¶ 1    Respondent, L.O., is the biological mother of the named minor, J.R. Following adjudication

and dispositional hearings, the trial court found J.R. to be abused and neglected pursuant to the

Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2018)), determined that L.O. was

unable to care for J.R., and placed J.R. in the custody of his father. L.O. appeals from the

adjudication and dispositional orders, solely arguing that the trial court's finding of abuse based

on substantial risk of physical injury was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    L.O. is the biological mother of J.R., born May 15, 2013. During the proceedings, the father was identified as Josef R.

¶ 4    On May 20, 2020, the State filed a petition for adjudication of wardship for J.R. (then age seven), alleging that he was neglected due to an injurious environment (id. § 2-3(1)(b)) and abused due to a substantial risk of physical injury (*id*. § 2-3(2)(ii)). In support of both allegations, the petition set forth the following:

> "Mother has two prior indicated reports for risk of harm. Mother and legal father have a history of domestic violence. Mother and current paramour also have a history of domestic violence. Mother has previously been diagnosed with major depressive disorder, PTSD and alcohol use disorder. Mother previously received intact family services. On or about May 1, 2020, mother and current paramour were involved in a domestic violence incident wherein paramour hit, punched, slapped and choked her. Mother initially denied the recent domestic violence incident with her current paramour and stated she is not receiving any mental health treatment or medication. On or about May 3, 2020, mother was involved, as driver, in a car accident and at the time reportedly smelled of alcohol and had open containers of alcohol in the car. After the accident mother was throwing items in the relative's home while the minor was present."

¶ 5    The petition and motion for temporary custody were accompanied by an affidavit from Serina Mathena, a Department of Children and Family Services (DCFS) investigator. She averred that L.O.'s "combination of issues related to domestic violence, chronic mental health conditions,

and substance abuse" as well as "a lack of innate parenting capacity" created an urgent need to take protective custody of J.R.

¶ 6    The court granted the State's motion for temporary custody, finding that it was necessary to remove J.R. from L.O.'s custody.

¶ 7    On October 18, 2021, and January 6, 2022, an adjudicatory hearing was held before the trial court. The following evidence was presented.

¶ 8    The State entered into evidence several exhibits, including L.O.'s medical records from Gottlieb Memorial Hospital, PCC Wellness, and Loyola Medicine, and L.O.'s 2016 conviction for child endangerment. Some of the medical records were admitted over L.O.'s objection as to relevance, particularly for those dating between 2009 and 2013. The court stated that it would give the records the appropriate weight.

¶ 9    The medical records show a history of psychiatric hospitalizations, at least once for suicidal ideation, and repeated diagnoses of bipolar disorder, depression, anxiety, and posttraumatic stress disorder (PTSD). One of her hospitalizations, occurring in 2017, was the result of a text message she sent to her boyfriend threatening to kill herself. The records indicate that the police found her walking outside with J.R. at night, barefoot and wearing nothing but a bathrobe. Documents from L.O.'s initial behavioral health appointment in 2016 show that L.O. had a traumatic past that included domestic violence inflicted by Josef, homelessness, substance abuse, sexual assault, and prostitution. L.O. had also reported at that time suicidal ideation but no specific suicidal intent or plan.

¶ 10    The records related to her 2016 child endangerment conviction show that she was charged with child endangerment and domestic battery and she was sentenced on the child endangerment count with six months of supervision and parenting and anger management classes. Although the

conviction records do not describe the offense that took place, L.O.'s integrated assessment in the common law record provides that on May 11, 2016, it was reported that L.O. assaulted her mother and J.R. was being held by her mother at the time.

¶ 11     Gabrielle, J.R.'s maternal aunt, testified that L.O. and J.R. came to live with her in 2017 and L.O. moved out in May 2020. She stated that L.O. and J.R. previously lived with Anna, Gabrielle and L.O.'s mother, and she understood that they moved out because there were disagreements and aggression among the household members. While J.R. was living with Gabrielle, he would go to daycare during the day when Gabrielle and her husband were at work and her husband would pick him up from daycare. When they first moved in with Gabrielle, DCFS did not allow L.O. to be alone with J.R. At some point, that restriction was lifted and she was able to pick him up when he began attending school. On the weekends, J.R. would stay with Anna. Gabrielle knew that L.O. was in a relationship with Edwin but did not know if that is where L.O. stayed on the weekends.

¶ 12     In regards to the car accident, Gabrielle testified that she and J.R. were asleep in her bedroom when L.O. was dropped off at Gabrielle's house around 2 a.m. When L.O. came into the bedroom to pick up J.R., Gabrielle smelled alcohol on L.O., and she testified that the scent was strong enough to smell it from a couple feet away. She told L.O. that she should leave J.R. where he was until she was actually ready to go to sleep so as not to disturb him. L.O. became upset, and Gabrielle reluctantly let L.O. take J.R. into her bedroom. Gabrielle then heard L.O. making a lot of noise in her bedroom. She testified that it sounded like L.O. was opening and shutting drawers roughly and throwing things. She also heard L.O. yelling and swearing at someone on the phone, which she later learned was their mother. L.O. was telling her mother to come back and pick her up. Gabrielle went to get J.R. from the bedroom at this point. When she entered the room, she saw

the lights were on and J.R. was awake and looked scared. An argument ensued between Gabrielle and L.O., and Gabrielle ultimately told her to leave. L.O. left the house for some time but eventually came back and went to sleep.

¶ 13    Later that day, after L.O.'s car had been retrieved and fixed, Gabrielle observed L.O. packing her belongings. Gabrielle was not concerned about L.O. leaving the home but became involved when L.O. began packing J.R.'s belongings as well and stated that she was taking J.R. to her apartment. Gabrielle responded that she was not going to let L.O. take him away from her home to a place that she did not know anything about. Gabrielle took J.R. to their mother's house because she was worried L.O. was going to disappear with him.

¶ 14    Gabrielle testified that during this time period she was concerned that L.O. would leave J.R. unattended and not provide appropriate care for him. She also testified that she was not aware of the apartment that L.O. rented and she believed L.O. did not have any place to live. Eventually, L.O. did move out of Gabrielle's home but Gabrielle did not know where she went.

¶ 15    On cross-examination, Gabrielle testified that when L.O. moved into her home, she was concerned about L.O.'s alcohol use and made a point to keep an eye for that behavior. Gabrielle did not observe her drinking during the week when J.R. was at the home. Gabrielle believed that L.O. was intoxicated on the night of the car accident because of the smell and because L.O. was acting irrational and angry.

¶ 16    Mathena testified that, in May 2020, she was assigned to investigate a report regarding J.R. alleging substantial risk of physical injury and injurious environment. During her investigation, she found two prior indicated reports from May 2016 and November 2017. Both allegations were for substantial risk of harm. She spoke on the phone with L.O. and informed her that an allegation had been made regarding a car accident where L.O. had been intoxicated and that she was throwing

things around the bedroom while J.R. was present. L.O. denied everything. She also said that if those things happened, J.R. was not present. L.O. relayed her suspicion that her brother or another family member had made the report to DCFS.

¶ 17    That same day Mathena visited Anna's residence where she listened in on a phone call between Gabrielle, Anna, and L.O. During the call, L.O., using profanity, instructed her family to stop making reports to DCFS. During this visit, Mathena also spoke with J.R. From the night of the car accident, J.R. recalled his mother moving things around the room, including tossing some things, and using profanity. He reported that the entire situation was "hurtful" and that the process had been "hurting." He described how he felt as a "blue screen *** like what happens on the old computer monitors when it shuts down."

¶ 18    On May 7, 2020, Mathena visited L.O. at her home. Mathena testified that L.O. appeared disheveled and had what appeared to be superficial self-harm cuts on her left forearm. She reported that Edwin had moved out a couple months prior. L.O. denied any domestic violence between herself and Edwin. Despite Mathena informing her that she was aware of an incident, L.O. continued to deny any violence but stated that she did have an incident with the neighbors. She stated that she was not a victim in that incident. Mathena then asked her about the car accident, which L.O. initially denied having occurred. L.O. stated that her tires blew out on the highway, and she had contacted her mother to pick her up from a hotel parking lot that she had pulled into. She also reported to Mathena that there was some conflict later that night when she tried to remove J.R. from Gabrielle's bedroom. She stated that she was in process of moving so the room was cluttered and items were packed away. L.O. denied that she was drunk that night and later stated that, even if she was intoxicated and blew a tire, DCFS should not be involved because J.R. was not present.

¶ 19    Mathena spoke with L.O. on the phone a couple days later to discuss the required mental health assessment. L.O. stated that the assessment had been completed at the emergency room and she had received a recommendation for outpatient counseling. L.O. stated that she did not believe she needed counseling.

¶ 20    Mathena testified that, after conferring with her supervisor, the allegation was found to be indicated.

¶ 21    On cross-examination, Mathena testified that, during her investigation, she was unable to confirm whether L.O. was actively involved in mental health treatment. She also testified that J.R. appeared adequately nourished and she did not observe any signs of physical abuse or neglect.

¶ 22    Chicago police officer Rebecca Warner testified that, on May 1, 2020, around 10:50 p.m., she and her partner responded to a report of a battery in progress at L.O. and Edwin's apartment. Upon arrival, the neighbors informed her that they had called the police because there was a domestic disturbance in the apartment above them. They informed Officer Warner that Edwin followed L.O. outside and continued to strike her about the face and body. Edwin was detained. Officer Warner spoke with L.O. and learned that Edwin had been drinking alcohol, became aggressive towards L.O., and began striking her on her face and body. Edwin was slapping, kicking, and punching her. He also grabbed her by the throat and choked her. She then ran outside the apartment towards her car, and he followed her and continued to hit her until the neighbors intervened. L.O. refused medical attention and refused to charge Edwin. Officer Warner gave her information on domestic violence and orders of protection. Officer Warner testified that L.O. was "shook up" and "nervous." On cross-examination, Officer Warner testified that she did not see any bruises or red marks on L.O.'s face, and there was no minor present at the scene. She also testified that there was no indication that L.O. was intoxicated at the time.

¶ 23    Clarissa Carrion, an intact clinical supervisor with Omni Youth Services, testified that she was assigned to L.O. and J.R.'s case in February 2018. There had been a prior indicated report in November 2017, which prompted the intact services. When she met with L.O., the plan was for L.O. and J.R. to reside with Gabrielle. Mental health, domestic violence, and parenting services were recommended. L.O. completed the parenting classes and engaged in domestic violence and individual therapy services. The intact case was successfully closed in February 2019. Around the time the case was closed, L.O. was self-reporting to Carrion that she was still receiving mental health treatment.

¶ 24    L.O. testified that she lived with Josef until J.R. was two years old. During that time, an incident of domestic violence occurred where Josef hit L.O. She and J.R. then moved in with her mother for two years. Her brother, Michael, also lived with them at that time. L.O. denied that there was a domestic violence incident involving Michael and herself, and she denied that she and Michael had struck each other, resulting in her moving out. She further denied Michael obtaining an order of protection against her. For the following three years, until May 2020, she and J.R. lived with her sister, Gabrielle. She testified that Josef rarely visited J.R. during these years.

¶ 25    While living with Gabrielle, L.O. was in a romantic relationship with a man named Edwin, and she would occasionally stay at his home, leaving J.R. with her mother. She admitted that her name was also on the lease for Edwin's home. She testified that on May 1, 2020, Edwin was arrested at the home after neighbors in the building called the police that evening. L.O. denied that Edwin struck, kicked, punched, or choked her that evening. L.O. further denied the police being called to the home on multiple other occasions in 2019.

¶ 26    L.O. testified that on May 4, 2020, her mother picked her up from the parking lot of a hotel in Hillside, Illinois, after she had been in a car accident while driving. She testified that her tires

had popped and the axle was broken, causing her to slightly hit the highway rails before she exited the highway. She denied that there were bottles of alcohol in the car at the time. Her mother drove her to Gabrielle's home, where she argued with her sister. She denied telling Gabrielle that she was leaving with J.R. According to L.O., she wanted to go to the park and she left because Gabrielle and Anna were arguing. She testified that instead Gabrielle took J.R. to Anna's home. A few days later, L.O. moved out of Gabrielle's and into the home where Edwin lived.

¶ 27    On cross-examination, she testified that on May 1 she argued with Edwin and, contrary to her previous statement that the neighbors called the police, she called the police on Edwin, who was arrested. She testified that J.R. was not present on that evening. She further testified that she was not drinking alcohol on the day of the car accident and no other cars were involved. She testified that, when she was at her sister's home, she removed items from her bed so that she and J.R. could go to sleep, but she did not throw these items and she did not break anything.

¶ 28    L.O. made an offer of proof regarding witnesses she wanted to call, and the parties made closing arguments.

¶ 29    On January 6, 2022, the court entered its adjudication order finding by a preponderance of the evidence that the State met its burden of proof as to both allegations of neglect due to injurious environment and abuse due to substantial risk of physical injury. That finding was based on the domestic violence incident in May 2020 and Officer Warner's credible testimony. The court also found Gabrielle's testimony credible, particularly her statement that she smelled alcohol on L.O.'s breath after the car accident. The court orally stated, in regards to L.O.'s behavior in J.R.'s presence, that there was "great concern about [L.O.'s] mental stability as well as her sobriety."

¶ 30    On July 12, 2022, a dispositional hearing was held before the trial court. At this time, both parents had filed motions for J.R. to be returned home to their care respectively. At the hearing,

Kim Gray, the caseworker assigned to J.R.'s case, testified as to the parties' progress since temporary custody was entered. Gray testified that DCFS discussed both parents' motions for J.R. to be returned to their individual care, and she stated that it was not an easy decision to make. The recommendation was for J.R. to be returned home to Josef, who appeared to be more stable than L.O., and to continue weekend visits with L.O.

¶ 31 That day, the trial court entered an order making J.R. a ward of the court and finding L.O. unable to care for J.R. and Josef to be fit, able, and willing to care for J.R. The court returned J.R. to Josef's care. In so ruling, the court stated that both parents were making progress but there were concerns that L.O. was not "fully processing why we are here" after she reported to the caseworker that the case was "all a lie."

¶ 32 This appeal followed.

¶ 33                                   II. ANALYSIS

¶ 34 On appeal, L.O. solely asserts that the trial court's finding that J.R. was abused was against the manifest weight of the evidence and that the finding should be reversed.

¶ 35 The purpose of the Act is to "secure for each minor subject hereto such care and guidance *** as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." 705 ILCS 405/1-2(1) (West 2018). The Act sets forth the procedures the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462-63 (2004). The process is initiated when the State files a petition for wardship and the minor is placed in temporary custody. *Id.* at 462. From there, the trial court conducts an adjudicatory hearing, where "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2018). If the trial court determines that a minor is abused

or neglected, the court then conducts a dispositional hearing. *Id*. § 2-21(2). At the dispositional hearing, the trial court determines "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.*

¶ 36    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463. In adjudication proceedings, the State has the burden of proving allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Stated another way, the State must demonstrate that the abuse and neglect allegations are more probably true than not. *Arthur H.*, 212 Ill. 2d at 464. Significantly, the same evidence that supports findings of abuse can also support findings of neglect. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 46.

¶ 37    The reviewing court is deferential towards the trial court's findings of fact because "the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence." *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006). A reviewing court will not reverse a trial court's finding of abuse or neglect unless it is against the manifest weight of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 38    In the case before us, L.O. only disputes the trial court's finding of abuse. She does not dispute the finding of neglect nor does she challenge the dispositional order. Any such argument is forfeited, and as a result, L.O. has conceded that J.R. was neglected based on an injurious environment. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.". On this basis, the State and the public guardian argue that the appeal is moot as it does not involve any actual controversy and relief in this court, *i.e.*, a reversal of the abuse finding, would not have any practical effect on the parties.

¶ 39    To revisit the statute at issue, section 2-21(2) of the Act provides that if the court determines that "the minor is *either abused or neglected or dependent*," then a dispositional hearing shall be held to determine whether it is in the best interest of the minor to be adjudged a ward of the court. (Emphasis added.) 705 ILCS 405/2-21(2) (West 2018). As such, the court only need make one of those findings to proceed to a dispositional hearing. The question before us then is whether L.O.'s challenge to only one of the trial court's findings, *i.e.*, abuse, renders her challenge on appeal moot.

¶ 40    "[C]ourts of review will generally not decide abstract, hypothetical or moot questions." *Adams v. Bath & Body Works, Inc.*, 358 Ill. App. 3d 387, 399 (2005). An appeal is considered "moot" where there is no actual controversy and a reviewing court's decision could have no practical effect on the parties. *In re Ivan H.*, 382 Ill. App. 3d 1093, 1099 (2008) (citing *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006)).

¶ 41    We first address two recently issued decisions from this court, which come to opposite conclusions on this same issue. L.O. relies on *In re S.G.*, 2022 IL App (1st) 210899, and the State and public guardian rely on *In re G.U.*, 2022 IL App (1st) 220759. In both cases, the trial court made findings of abuse and neglect for the named minors, but the mother only challenged the abuse finding on appeal.

¶ 42    In *S.G.*, as stated, the respondent challenged only the trial court's abuse finding but did not challenge the neglect finding or the court's dispositional order. The public guardian argued that the appeal was moot. 2022 IL App (1st) 210899, ¶¶ 21, 24. In determining that the appeal was not moot, a panel of this court rejected the proposition "that a failure to challenge *all* bases for an adjudication of wardship means that a parent is not entitled to challenge *any* of the bases." (Emphases in original.) *Id.* ¶ 24. The court additionally pointed out that there have been cases

where this court has reviewed an appeal where only one of several bases is challenged. *Id.* (citing *In re A.S.*, 2022 IL App (1st) 200560, ¶ 22).

¶ 43    However, we note that the *S.G.* court did not address the mootness doctrine's rationale, *i.e.*, to limit the court's review to actual controversies in cases where the relief requested would have a practical effect. Additionally, whether the same allegations can support both findings of abuse and neglect is not relevant to the issue of mootness. See *S.G.*, 2022 IL App (1st) 210899, ¶ 24 (stating that even though the abuse and neglect findings may be supported by the same evidence, they were separate bases and the respondent was entitled to present her arguments challenging just one of them). The argument here is that the concession of the neglect finding effectively renders the abuse finding, and our review of it, superfluous as the neglect finding was sufficient to trigger a dispositional hearing. Whether the same allegations support both findings is of no moment. For these reasons, we decline to follow *S.G.* See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) (stating that we are not bound by the opinions of sister appellate courts).

¶ 44    Rather, we agree with the analysis and decision in *In re G.U.*, 2022 IL App (1st) 220759, which was decided by yet another panel of this court, after *In re S.G.*. In *G.U.*, the trial court found all three named minors to be neglected and additionally found one of the minors to be abused. *Id.* ¶ 2. On appeal, the mother only challenged the finding of abuse, not the findings of neglect. *Id.* ¶ 19. The *G.U.* court first found that the issue of whether evidence established that the minors were neglected had been waived. *Id.* Because of the waiver, the court subsequently determined that the mother's challenge to the abuse finding was moot, stating that the finding of neglect alone was sufficient for the case to proceed to a dispositional hearing. *Id.* ¶¶ 19-20. The court specifically remarked that it is unclear what the practical effect would be even if it were to conclude that the abuse finding was against the manifest weight of the evidence. *Id.* ¶ 20; see also *In re Lakita B.*,

297 Ill. App. 3d 985 (1998) (where this court concluded that the respondent's concession as to the trial court's finding that she was unable to care for the minor was sufficient to support the dispositional order, and therefore the challenge to the additional finding of respondent's unfitness was moot).

¶ 45    Similarly here, even if we were to find that the abuse finding was erroneous, the dispositional order would not be vacated and the finding of L.O.'s inability to care for J.R. would remain intact. No practical effect would be had on the parties. L.O. contends in her reply brief that her reputation is affected by having an abuse finding, as well as a neglect finding, in this case. However, she cites to no case that stands for such a proposition. Her concerns regarding the recording of indicated reports in the central register are better directed at DCFS, as opposed to the courts, as the allegations in this case were indicated prior to this court's adjudication. It is common for concessions of an issue to have an impact on an appeal, and we see no reason to ignore the effect of her concession here.

¶ 46    Our conclusion here is additionally informed by two Illinois Supreme Court cases that are, to a certain extent, analogous.

¶ 47    In *In re Faith B.*, 216 Ill. 2d 1, 9-12 (2005), the trial court found that the minors were abused and neglected after an adjudicatory hearing, and on appeal, the mother challenged both findings. The supreme court first reviewed the trial court's finding of neglect based on injurious environment and affirmed the trial court's finding. *Id.* at 13-14. The court then went on to state that it did not need to review the trial court's finding of abuse as it had already upheld the finding of neglect. *Id.* at 15. The supreme court recognized that only one finding of either abuse, neglect, or dependency is necessary to affirm a trial court's judgment, and from this, we infer that the

supreme court would also agree that if one of multiple bases for the court's judgment is conceded, then there is no need to review the additional bases.[1]

¶ 48 Further, similar to the case before us, in *In re D.L.*, 191 Ill. 2d 1 (2000), the supreme court found that an issue was moot as a result of the mother's concession, albeit within the context of the termination of parental rights. There, the trial court concluded that the State had failed to prove any of the grounds for unfitness on its petition for termination of the mother's parental rights. *Id.* at 6. Both the State and the public guardian appealed, and this court reversed and remanded, finding that the State had established at least three grounds on which the mother was an unfit parent. *Id.* at 7. The mother then appealed from that ruling to the supreme court. *Id.* The supreme court pointed out that the mother had challenged "only one of the grounds on which the appellate court determined that she could be unfit" and therefore her failure to challenge the other grounds rendered her appeal moot. *Id.* at 8. Nonetheless, the supreme court decided to review the case on its merits because interpretation of the unfitness statute was "of substantial public importance, the relevant appellate court precedents are in conflict, and the issue is one that is likely to recur." *Id.*

¶ 49 Although different statutory schemes are involved, they include a similar mechanism in that there are multiple bases to trigger termination of parental rights and multiple bases to trigger a dispositional hearing. The supreme court clearly indicated that a party's concession through waiver of one basis for the trial court's judgment renders a claim as to another basis moot because there is no actual controversy and the outcome of the judgment would not be altered regardless of the claim's merits.

---

[1] We acknowledge that there are innumerable cases where this court has reviewed each finding of abuse and neglect; however, that does not necessitate a contrary finding of mootness here.

¶ 50    Because the supreme court's conclusion that the issue was moot did not result in the ultimate disposition, its opinion on mootness constitutes *dictum*. There are two types of *dicta*: *obiter dictum* and judicial *dictum. Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 277 (2009). The former is "not essential to the outcome of the case, is not an integral part of the opinion, and is generally not binding authority or precedent within the *stare decisis* rule." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010). The latter, however, is "an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause." *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). Judicial *dictum* is thus "entitled to much weight, and should be followed unless found to be erroneous." *Id.* We find the court's opinion on the mootness of the mother's appeal to be judicial *dictum*, and we must follow it.

¶ 51    There is no need to determine whether an exception to mootness applies here because even if we were to review the claim on its merits, we would nonetheless conclude that it was not against the manifest weight of the evidence for the trial court to find J.R. to be abused due to substantial risk of physical injury.

¶ 52    An abused minor under section 2-3 of the Act includes one whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2020). It is sufficient that there be substantial risk of physical injury; actual injury is not required. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. We reiterate that each case involving abuse and neglect allegations must be decided on its own unique facts. *Arthur H.*, 212 Ill. 2d at 463.

¶ 53    Adjudications of abuse and neglect must be reviewed based on the totality of the evidence. See *In re A.W., Jr.*, 231 Ill. 2d 241, 261 (2008). Considering the totality of the evidence in the record, we conclude that the State proved by a preponderance of the evidence that J.R. was at substantial risk of injury because there were two prior indicated reports of substantial risk of injury from 2016 and 2017, both where J.R. was present; L.O. had been convicted of child endangerment stemming from one of those reports in 2016; L.O. had a history of mental illness, psychiatric hospitalizations, and substance abuse; there was a history of domestic violence involving L.O., including a recent incident with a boyfriend; there was a recent car accident accompanied by credible testimony that L.O. had been intoxicated at the time; and there was an episode of anger and erratic behavior from L.O., where J.R. was present, and after which J.R. admitted that it was a "hurtful" event.

¶ 54    In particular, the evidence in the record shows that there was testimony from Gabrielle that L.O. was intoxicated the night she was in a car accident. L.O. denied that she was intoxicated but continued that, even if she were, J.R. was not present and DCFS should not be involved. The court found Gabrielle's testimony to be credible, and we will not substitute our judgment for that of the trial court on matters of credibility. See *In re D.F.*, 201 Ill. 2d 476, 499 (2002). Additionally, the fact that J.R. was not in the car at the time of the accident does not defeat the argument that L.O.'s alcohol use is concerning to J.R.'s safety and well-being, as the court remarked during the adjudication hearing. L.O.'s lack of accountability for her actions, which is also concerning, must also be considered.

¶ 55    Additionally, while she was intoxicated in the presence of J.R., she proceeded to behave in a manner that negatively affected J.R. At 2 a.m., she was throwing things about the room and yelling and using profanity towards her mother on the phone. This was a clear disruption of J.R.'s

sleep, and he expressly told Mathena that the event was "hurtful" and caused him to shut down like a blue screen on a computer, an indication that J.R.'s emotional well-being and mental health had been affected by L.O.'s conduct.

¶ 56    The concerns regarding that incident are compounded by the domestic violence incident occurring only days prior. Again, J.R. was not present but the presence of an individual in his mother's life who hits, slaps, kicks, and chokes her while under the influence of alcohol can certainly be construed as a risk to J.R., especially where L.O. has her own history with alcohol use. There was also evidence in the record that L.O. and J.R.'s 2017 relocation from her mother's home to Gabrielle's was precipitated by conflict with her brother, who also lived at her mother's home. Further, L.O. had a child endangerment conviction from 2016 that required her to take both parenting and anger management classes, which she completed. The fact that these issues continued to persist despite previous court intervention and DCFS intact services demonstrates a continued risk to J.R.'s emotional and physical health.

¶ 57    We briefly address L.O.'s arguments as to why the evidence did not support an abuse finding. First, she argues that abuse is a "more serious and stringent" finding, suggesting that it requires stronger evidence. This contention is refuted by the many cases that have found that the same allegations supporting the finding of neglect due to injurious environment also supported the finding of abuse due to substantial risk of physical injury. See *In re A.S.*, 2020 IL App (1st) 200560, ¶ 34; *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44; *In re Kenneth D.*, 364 Ill. App. 3d 797 (2006). This court has held repeatedly that the same allegations can support abuse and neglect findings. See *In re R.G.*, 2012 IL App (1st) 120193, ¶ 46. As such, we reject her argument that the evidence for abuse based on substantial risk of injury must be "more serious" than that required for neglect due to injurious environment.

¶ 58    Second, L.O. contends that the record does not show that J.R. was at substantial risk of physical injury because "he had never been physically injured, nor threatened with physical injury, nor was any physical violence directed at him, nor was he placed in a situation where anyone else was likely to harm him." She then suggests that we should reject the State and public guardian's assertion that J.R. sustained "impairment of emotional health." L.O. seemingly argues that emotional health should not be considered in determining whether there is a substantial risk of physical injury, contrary to the statutory provision.

¶ 59    It is well established that actual physical injury is not required to sustain a finding of abuse based on substantial risk of injury. See *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35 (stating that the statute only requires substantial risk of physical injury, not proof that such an injury occurred). We further find applicable here the *A.S.* court's remark that, "[t]he fact that no one happened to be seriously injured during the previous instances of violence is merely fortuitous, not proof that respondent's conduct is acceptable." *Id.* In the recent incidents, L.O. herself was engaging in risky behavior, involved in a violent relationship, and later acted in erratic behavior in front of J.R. due to her frustration and anger. There was testimony that J.R. had already been emotionally harmed due to her behavior. She also did not take responsibility for those actions, which suggests that she does not understand the potential harm, placing J.R. at a greater risk for permanent physical or emotional harm in the future. See *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39 ("[O]ur courts have made clear that we need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding may be upheld."). As such, we do not find this argument persuasive.

¶ 60    Further, by including the language "impairment of emotional health" into the statute, the legislature has clearly signaled that emotional and mental health of children is of paramount

concern and on the same level of physical injury. It is imperative that we do not overlook markers of emotional and mental abuse or the deterioration of mental or emotional health because they are not always obvious to the untrained eye. Thus, L.O.'s dismissal of that type of injury is not well taken.

¶ 61 We also find both cases cited by L.O. distinguishable, where the unique factual circumstances of each case are simply not comparable to those before us. L.O. first cites to *In re M.W.*, 386 Ill. App. 3d 186, 198 (2008), as an example of a similar case where the court found that an abuse finding was not warranted. There, the case arose because the minor's half-brother was adjudicated abused and neglected based on severe child abuse caused by the mother's boyfriend at the time. *Id.* at 188-89. The trial court found that the minor was neglected due to an injurious environment but did not find that he was abused due to a substantial risk of physical injury. *Id.* at 187. The State and public guardian appealed to this court, contending that the State met its burden on the abuse allegation. *Id.* at 196-97. The State and public guardian argued that the mother was diagnosed with mood disorders, and she had failed to complete therapy as related to the abuse of the half-brother. *Id.* at 197. This court affirmed the trial court's decision, finding that the abuse perpetrator was no longer involved in the situation, the minor lived with the respondents without incident, he appeared healthy and cared for, and there was no history of violent behavior where either respondent was the perpetrator. *Id.* at 198. Effectively, this court refused to make a *per se* finding of abuse based on the prior abuse of another child by an individual no longer involved in the minor's life. *Id.*

¶ 62 In *In re N.B.*, 191 Ill. 2d 338, 345 (2000), additionally cited by L.O., the supreme court reviewed the trial court's finding of neglect due to an injurious environment, which we point out is not the finding we are faced with here. In any case, the finding there was based on one incident

of anger by the respondent, where she threw "a tantrum" when she was unable to get formula for her baby at a health department facility and she kicked a chair, hit the baby carrier against a wall, and yelled at an employee. *Id.* at 347. There was no suggestion that the baby was harmed, and the respondent caused no damage. *Id.* The anger was directed at employees, not her children. There were no prior indicated reports, and extensive testimony that the respondent took care of her children and was concerned for their well-being. *Id.* at 350-51. According to the supreme court, the evidence "failed to show anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury." *Id.* at 353.

¶ 63    The facts of these cases are markedly different from the case before us, particularly where there have been multiple documented incidents involving J.R. that have exposed him to risk of injury, in addition to L.O.'s history of mental health and substance abuse issues. As such, we find these cases inapposite.

¶ 64    We recognize that the incidents that led up to the disposition of wardship are by no means the most egregious that our courts have seen; neither are the incidents as reported here to be taken lightly. We are cognizant that the well-being of a minor is at stake and also of the procedural stage of these proceedings. On review, we conclude that the record does not demonstrate that the trial court should have reached the opposite result, nor does it indicate that the trial court's decision was unreasonable or arbitrary.

¶ 65    Accordingly, the trial court's finding of abuse based on a substantial risk of physical injury was not against the manifest weight of the evidence.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court.

¶ 68    Affirmed.

**In re J.R., 2022 IL App (1st) 221109**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-JA-783; the Hon. John Huff and the Hon. Tiesha Smith, Judges, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Victoria Kennedy, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for other appellee. |