2023 IL App (1st) 220756-U

No. 1-22-0756

Third Division
June 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| JESSICA MITCHELL, | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 2021 CH 3276 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF CHILDREN AND | ) | The Honorable |
| FAMILY SERVICES, and its Director, MARC D. | ) | Alison C. Conlon, |
| SMITH, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The Director's decision to deny plaintiff's request to expunge indicated findings of abuse and neglect is affirmed, where the evidence supported the allegations.

¶ 2    After an investigation, defendant Illinois Department of Children and Family Services (DCFS) entered indicated findings of abuse and neglect against plaintiff Jessica Mitchell (plaintiff), based largely on allegations of physical and sexual abuse of plaintiff's 9-year-old daughter. Plaintiff contested the findings, seeking to have them expunged, and after a hearing,

an administrative law judge (ALJ) found that the preponderance of the evidence supported the findings and recommended denying plaintiff's expungement request. The director of DCFS (Director) accepted the ALJ's recommendation and denied the expungement request. Plaintiff sought administrative review in the circuit court, and the circuit court affirmed the Director's decision. Plaintiff now appeals, arguing that the Director's factual findings were against the manifest weight of the evidence and the denial of her request was clearly erroneous. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Plaintiff and her former husband Erik Mitchell (Erik) are the parents of A.M., who was nine years old at the time of the alleged abuse and neglect at issue. In October 2019, DCFS received a report that A.M. had been threatened at gunpoint and raped by plaintiff's boyfriend, Michael Wisneski (Wisneski).[1] During a forensic interview, A.M. disclosed that plaintiff was aware of, and assisted in, the abuse. Plaintiff initially denied that she knew Wisneski, but subsequently admitted that A.M.'s allegations of physical and sexual abuse were accurate. Plaintiff claimed, however, that she was also a victim of Wisneski and did not willingly engage in any abuse of her daughter.

¶ 5      After an investigation, DCFS determined that plaintiff had abused and neglected A.M., indicating plaintiff for three allegations of harm: allegation 10, substantial risk of physical injury/environment injurious to health and welfare; allegation 19, sexual penetration; and allegation 85, environmental neglect. DCFS informed plaintiff that the indicated findings would be maintained on the State Central Register for 50 years.

---

[1] Neither Erik nor Wisneski are parties to the instant appeal.

¶ 6        Plaintiff timely filed a request for an administrative appeal of the indicated findings, seeking an expungement of the indicated findings from the register. The testimony and evidence presented to the ALJ included the following.

¶ 7        Shawna Myrick (Myrick), a DCFS child protection specialist, testified that she was assigned to investigate the allegations against plaintiff. Myrick interviewed plaintiff as part of her investigation, and plaintiff denied even knowing Wisneski, stating that A.M. was "making these things up because she had recently taken her cell phone from her." At a later interview, however, plaintiff indicated that A.M.'s version of events was true, but claimed that she had been held against her will by Wisneski, including being abducted by him several weeks after A.M. had been abused. Plaintiff also informed a police detective that "she allowed [Wisneski] to have his way with her and her daughter" due to his threats to harm her and her family. Myrick, however, testified that there were numerous occasions where plaintiff was not in the presence of Wisneski and would have been able to report the alleged threats and abuse.

¶ 8        Myrick also interviewed A.M. as part of her investigation, and A.M. stated that she was afraid of plaintiff and Wisneski, who she described as plaintiff's "boyfriend." A.M. told Myrick that plaintiff had permitted Wisneski to do inappropriate things to A.M., including bathing her, taking photographs of her, and having sex with her. He also hit A.M. with a hairbrush and threatened to kill A.M. and plaintiff, displaying a firearm on several occasions. A.M. reported that plaintiff was "in the room sometimes watching and assisting" while Wisneski sexually abused A.M. Myrick asked A.M. about plaintiff's relationship with Wisneski, and A.M. stated that plaintiff had indicated that she was going to marry him and they would live in his house.

¶ 9     Myrick was also present when A.M. participated in a forensic interview at a child advocacy center.[2] At the interview, A.M. disclosed that Wisneski had penetrated her vaginally, had forced her to perform oral sex on him, and had threatened to kill her and plaintiff. A.M. further disclosed that plaintiff had allowed Wisneski to bathe A.M. on several occasions, during which Wisneski took photos and videos of her. At one point, A.M. also reported that plaintiff held her legs down while Wisneski had sex with her, and told A.M. something to the effect of "[i]f she did what she was told, these things wouldn't happen." Plaintiff also took A.M.'s phone, so she could not call the police.

¶ 10    Myrick observed additional forensic interviews of one or two of A.M.'s friends, to whom A.M. had disclosed the abuse. Myrick testified that the disclosures made to the friends were consistent with A.M.'s comments to Myrick and during the forensic interview.

¶ 11    Myrick testified that she also investigated an environmental neglect allegation and photographed plaintiff's home as part of the investigation. At plaintiff's home, Myrick observed that the home was "very cluttered," such that there was no place to sit, no space for A.M. to sleep on her bed, and only a narrow walking path cleared throughout the home. Myrick further observed old garbage, food, and dirty dishes.

¶ 12    After speaking with plaintiff and A.M., as well as police officers and school staff, Myrick and her supervisor agreed that credible evidence supported an indicated finding on all three allegations.

¶ 13    Erik testified that A.M. is his daughter and that she has resided with him since October 2019, after A.M. reported the abuse. After receiving a call from her school, Erik went to the

_____

[2] The forensic interview was not released by law enforcement for the administrative hearing, as there was an ongoing criminal investigation into the matter.

4

school, where A.M. informed him that she had been raped several times by "mom's boyfriend Mike." A.M. further told him that Wisneski had held a gun to her head. Erik took A.M. to the hospital for an examination, which revealed severe bruising on her buttocks area. Erik sought an order of protection to protect himself and A.M. from plaintiff and Wisneski, which was granted, and later sought permanent custody of A.M.

¶ 14     In his petition seeking permanent custody, Erik alleged that A.M. informed him that plaintiff held her down while Wisneski raped her, and was in the same bed while the abuse was occurring. A.M. cried for help "and her mom would not help her" but instead took away her phone so that she could not call the police. The matter of permanent custody was still pending, but Erik had temporary custody in the interim.

¶ 15     Plaintiff testified that she resided in a home in Bridgeview with A.M. She became acquainted with Wisneski through mutual friends, as they went to high school together, and was not dating him. They had begun "getting to know each other" and had only spent two days together prior to the incident at issue. Wisneski came to plaintiff's home to visit on a weekend when A.M. was with Erik, and was supposed to leave before A.M. came home on Sunday evening. Erik brought A.M. home early, however, while Wisneski was still there. Plaintiff opened the door to let A.M. in, turned around, and Wisneski "had a gun to our face." He forced them to undress, telling them that he would "blow [plaintiff's] brains out," kidnap A.M., and "sell her to the sex trade" if they did not comply. Wisneski also indicated that he knew where plaintiff's family and friends lived. Wisneski held plaintiff and A.M. at gunpoint until Wednesday, during which time he physically and sexually abused them. Plaintiff denied holding A.M.'s legs down, but testified that she was primarily concerned about staying alive.

¶ 16      Plaintiff begged to be allowed to take A.M. to school, which Wisneski allowed so long as she returned. While plaintiff drove her to school, she instructed A.M. to "get away" and to "tell," but knew that she "had to lie to save [A.M.]." When she returned, Wisneski was still in her home. After A.M. did not come home from school, plaintiff "knew that she had told" but was forced by Wisneski to deny A.M.'s allegations. Wisneski ultimately left, but threatened her before he left, telling her not to go to the police.

¶ 17      Several days later, after A.M. had reported the abuse to the police, Wisneski kidnapped plaintiff, first taking her to his home in New Lenox, Illinois, then taking her to North Carolina, where he "tortured" her and threatened her with guns and a machete. Plaintiff ultimately convinced him to return to Illinois, where she was able to escape; plaintiff had not seen Wisneski since. Plaintiff filed charges with the police, and sought treatment at the hospital for injuries arising from Wisneski's physical and sexual abuse of her. Plaintiff denied that she had ever sent any text messages indicating that she was in love with Wisneski or that she had ever told A.M. that she wanted to marry him and move to his house.

¶ 18      With respect to the condition of her home, plaintiff testified that, at the time at issue, she had been in the process of clearing out the house for a move to Florida and normally maintained her home in a clean state.

¶ 19      In addition to witness testimony, the evidence at the hearing also included the DCFS investigative file, plaintiff's medical records, and a letter sent to plaintiff by her doctor. The investigative file indicated that on October 9, 2019, A.M. reported that she was "concerned and fearful for her life," as plaintiff had brought a man into the home who had pulled a gun on her and threatened to kill A.M. and plaintiff. A.M. further reported that "Mike" had hit her with wooden spoons and hairbrushes and had raped her, and that plaintiff had taken her phone

so that she would not be able to call for help. A follow-up report dated several days later indicated that A.M. reported that "Mike" digitally and orally penetrated her and she had bruising on her buttocks from the incident. The report further indicated that the police were aware of the incident but that plaintiff was "not cooperating with the police and will not give them Mike's name." A later follow-up report stated that plaintiff denied the allegations until early December, when she "changed her story and stated that she too was raped, and held against her will."

¶ 20        Contact notes completed by Myrick demonstrated that, when she spoke with plaintiff on the day that A.M. initially reported the abuse, plaintiff "stated that her daughter lies about everything" and denied knowing "anyone by the name of Mike." Plaintiff further indicated that she had taken A.M.'s phone because she was grounded. Later contact notes from November 2019 indicated that Myrick had spoken with a detective on the case, who informed her that plaintiff was "on the run" with Wisneski in Kentucky. The detective further informed her that there were text messages between plaintiff and her family in which plaintiff told them that she loved Wisneski and wanted to marry him, as well as text messages between plaintiff and A.M. in which A.M. accused plaintiff of holding down her legs while Wisneski raped her and plaintiff responded that "no one is going to believe her about what was happening to her." Plaintiff's phone also contained nude photos of A.M. in the shower.[3]

¶ 21        Myrick's contact notes from December 2019 indicated that she had spoken with plaintiff, who claimed to have been kidnapped by Wisneski for the month of November, but had managed to escape from his home in New Lenox. Myrick spoke with the detective, who

---

[3] The contents of plaintiff's phone, including any text messages or photos, are not included in the record on appeal.

7

indicated that plaintiff had reported that everything A.M. had told them was true, but that Wisneski threatened to harm her and her family, "so she allowed him to have his way with her and her daughter." There was a warrant issued for Wisneski's arrest, but police had been unable to locate him. The detective also reported that plaintiff had gone to the hospital, where it was noted that she had bruising to her buttocks and the back of her legs, as well as light bruising to the bicep area, "but it didn't look like she was beaten." Plaintiff's hospital records demonstrated that she visited the hospital on December 2, 2019, where she reported that she had been kidnapped for the past month, during which she had been repeatedly raped.

¶ 22      After the hearing, the ALJ issued an opinion and recommendation, in which she found that a preponderance of the evidence supported the indicated findings against plaintiff and accordingly recommended denying plaintiff's request to expunge the abuse and neglect allegations. The ALJ found that plaintiff's contentions that she had no relationship with Wisneski were "not credible or reliable," pointing to A.M.'s statements about the relationship, as well as text messages found on plaintiff's cell phone. The ALJ found that "it is clear that the [plaintiff's] goal was to protect [Wisneski] to her daughter's detriment, and that this is why she initially denied that [Wisneski] existed, claiming instead that this was all something that her daughter had fabricated because she is a troubled child." The ALJ found unpersuasive plaintiff's contentions that she was a victim, as well, finding that "although [plaintiff] may have endured some mistreatment," she had multiple opportunities to seek assistance during the time in which A.M. was being abused. Indeed, the ALJ noted that "[t]here was at least one occasion that [plaintiff] was actually at the police station, yet she still did not make a report or take any steps to get help." Consequently, the ALJ concluded that DCFS had provided

evidence that plaintiff's actions met the definitions of abuse and neglect sufficient to sustain the indicated findings against her.

¶ 23 The Director adopted the ALJ's findings of fact and conclusions of law, and denied plaintiff's request for expungement of the indicated findings. Plaintiff then filed a complaint for administrative review in the circuit court, claiming that plaintiff was not a willing participant in A.M.'s abuse and instead was also a victim. Plaintiff further argued that the Director's decision was premised on a relationship between plaintiff and Wisneski "which in fact never existed." After a hearing, the circuit court found that the Director's findings of fact were not against the manifest weight of the evidence, nor was the final administrative decision clearly erroneous. Consequently, the circuit court affirmed the Director's decision denying expungement of the indicated findings against plaintiff. This appeal follows.

¶ 24 ANALYSIS

¶ 25 On appeal, plaintiff contends that the Director's findings of fact were against the manifest weight of the evidence and, therefore, the final administrative decision was clearly erroneous.

¶ 26 *Abused and Neglected Children Reporting Act*

¶ 27 The Abused and Neglected Child Reporting Act (the Act) requires DCFS to maintain a central register of all cases of suspected child abuse or neglect reported under the Act. 325 ILCS 5/7.7 (West 2020). DCFS investigates all reports and classifies them as " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " 325 ILCS 5/7.12 (West 2020); *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 267 (2004). A report is " 'indicated' " "if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2020). " 'Credible evidence of child abuse or neglect' means that the available

facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 300.20 (2018).

¶ 28       A subject of an indicated report may request that DCFS amend the record of the report or remove the record of the report from the State Central Register. 325 ILCS 5/7.16 (West 2020). If DCFS does not do so, the subject of the report has the right to an administrative hearing within DCFS to determine whether the record of the report should be amended or removed. *Id*. During the hearing, DCFS has the burden of proof in justifying the refusal to amend, expunge, or remove the record, and DCFS must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Adm. Code 336.115(c)(2) (2017). After the hearing, the Director receives the ALJ's recommendation and may accept, reject, amend, or return the recommendation. 89 Ill. Adm. Code 336.220(a)(2) (2017). The Director's decision is the final administrative decision by DCFS. *Id.*

¶ 29       Judicial review of the Director's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). 325 ILCS 5/7.16 (West 2020). In the case of an administrative review action, we review the decision of the administrative agency and not the decision of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006) (*per curiam*). Under the Administrative Review Law, actions to review a final administrative decision "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2020). Additionally, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." *Id*. The reviewing court is not to reweigh the evidence or make an independent determination of the facts. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009).

¶ 30        The reviewing court will defer to the agency's findings of fact unless they are against the manifest weight of the evidence. *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 30. A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The fact that an opposite conclusion is reasonable or that the reviewing court may have ruled differently does not justify reversal of the administrative agency; "[i]f the record contains evidence to support the agency's decision, it should be affirmed." *Id.*

¶ 31        An administrative agency's decision on a mixed question of law and fact is reviewed for clear error. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 (2006). This standard of review is deferential to the agency's expertise in interpreting and applying the statutes that it administers. *Schiller*, 221 Ill. 2d at 143. Where the decision of an administrative agency presents a mixed question of law and fact, " 'the agency decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed.' " (Internal quotation marks omitted.) *Schiller*, 221 Ill. 2d at 143 (quoting *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005)).

¶ 32                                        *Director's Decision*

¶ 33        In this case, plaintiff contends both that the Director's factual findings were against the manifest weight of the evidence and that the ultimate decision to deny her request was clearly erroneous. As an initial matter, while plaintiff claims to be appealing both the indicated findings of abuse and neglect, plaintiff's argument on appeal concerns only the abuse findings. Plaintiff's brief on appeal—and her briefing in support of her administrative review complaint

below—contains no argument as to the propriety of the indicated finding as to the environmental neglect allegation. It is well settled that points not argued in the appellant's brief are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Accordingly, the Director's decision as to the allegation of environmental neglect is affirmed and we discuss only plaintiff's challenges to the Director's decision as to the abuse allegations. See *In re J.R.*, 2022 IL App (1st) 221109, ¶ 38 (finding that the respondent had forfeited any challenge to the circuit court's finding of neglect where she challenged only the finding of abuse); *In re G.U.*, 2022 IL App (1st) 220759, ¶ 19 (same).

¶ 34    As noted, an indicated finding is one which is supported by credible evidence of child abuse or neglect. 325 ILCS 5/3 (West 2020). As relevant to the instant appeal, the Act defines an " '[a]bused child' " as "a child whose parent *** or a paramour of the child's parent *** creates a substantial risk of physical injury by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or mental health, or loss or impairment of any bodily function." 325 ILCS 5/3 (West 2020). An " '[a]bused child' " may also include a child whose parent or a paramour of the child's parent "commits or allows to be committed any sex offense against such child." *Id.* Based on this definition of abuse and the Act's definition of neglect, DCFS has promulgated regulations detailing a number of child abuse and neglect allegations, "essentially defining problematic conduct." *Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1181 (2010).

¶ 35    In this case, DCFS entered indicated findings of abuse against plaintiff based on two allegations of harm: allegation 10, substantial risk of physical injury/environment injurious to health and welfare; and allegation 19, sexual penetration. Allegation 10 concerns substantial risk of physical injury, which means, *inter alia*, that the child's parent or the parent's paramour

12

has created a real and significant danger of physical injury by other than accidental means which would likely cause death, disfigurement, impairment of physical health, or loss or impairment of any body function. 89 Ill. Adm. Code 300.Appendix B (2017). Allegation 10 further provides that "[t]his allegation of harm is to be used when the type or extent of harm is undefined but the total circumstances lead a reasonable person to believe that the child is at substantial risk of physical injury." *Id.* Examples of incidents which may cause a substantial risk of physical injury include, but are not limited to, choking the child, smothering the child, or "[o]ther violent or intimidating acts directed toward the child that cause excessive pain or fear." *Id.*

¶ 36         Allegation 19 concerns sexual penetration, which is defined as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or any animal or object into the sex organ or anus of another person."[4] *Id.* In order to enter an indicated finding based on this allegation, "benign touching for the purpose of rendering normal, routine and reasonable care must be ruled out." *Id.*

¶ 37         In the case at bar, the Director adopted the ALJ's findings of fact as to the allegations of abuse. On appeal, plaintiff does not appear to contest that the conduct to which A.M. was subjected would satisfy both allegations of abuse; indeed, plaintiff acknowledges that "[i]t is correct that A.M. was victimized in the most horrific manner possible." Instead, she challenges the conclusion that she was in any way responsible for Wisneski's conduct, claiming that the ALJ's "flawed and wholly uncorroborated characterization of Wisneski as being [plaintiff's]

_____

[4] We note that this definition mirrors the definition of " '[s]exual penetration' " contained in the Criminal Code of 2012. See 720 ILCS 5/11-0.1 (West 2020).

boyfriend \*\*\* underpins all of the allegations against" her. We do not find this argument persuasive.

¶ 38    In her decision, the ALJ expressly found that plaintiff's contentions that she had no relationship with Wisneski were "not credible or reliable," pointing to A.M.'s statements about the relationship, as well as text messages found on plaintiff's cell phone. The ALJ also considered plaintiff's explanation as to her changing story, namely, that she was also a victim of Wisneski's abuse, and found that explanation unpersuasive. The ALJ found that "although [plaintiff] may have endured some mistreatment," she had multiple opportunities to seek assistance during the time in which A.M. was being abused, including at least one occasion in which plaintiff was actually at the police station, yet still failed to take any steps to obtain help. The ALJ ultimately found that "it is clear that the [plaintiff's] goal was to protect [Wisneski] to her daughter's detriment, and that this is why she initially denied that [Wisneski] existed, claiming instead that this was all something that her daughter had fabricated because she is a troubled child."

¶ 39    It is the province of the administrative agency as the trier of fact to determine the credibility of witnesses and resolve conflicts in the evidence, and we will not substitute our judgment by reweighing the evidence or drawing our own conclusions as to the credibility of the witnesses. *Plowman v. Department of Children & Family Services*, 2017 IL App (1st) 160860, ¶ 24; *M.D. v. Department of Children & Family Services*, 2015 IL App (1st) 133901, ¶ 103. Here, the ALJ considered the testimony presented at the hearing, evidence including text messages discovered by police, and plaintiff's admittedly changing story, and made the factual finding that plaintiff was not credible concerning the circumstances surrounding A.M.'s abuse. We cannot say that these findings were against the manifest weight of the evidence.

¶ 40 Additionally, in light of the factual findings, we cannot say that the Director's ultimate decision was clearly erroneous. A.M. was physically and sexually abused for several days by a man plaintiff brought into the home, with plaintiff's full knowledge and, sometimes, with her assistance and cooperation. A.M. was prevented from calling for help when plaintiff took away her cell phone, and was only able to escape the abuse when she went to school, where she promptly reported it. Plaintiff, upon hearing of her daughter's claims, immediately denied them, accusing her daughter of lying and stating that she did not even know Wisneski. Plaintiff later admitted that everything A.M. had reported was accurate, but claimed that she had been victimized herself, causing her to initially lie. Under these facts, and giving due deference to the experience and expertise of DCFS, we cannot say that the Director's decision to deny plaintiff's request for expungement of the indicated findings of abuse against her was clearly erroneous.[5]

¶ 41                                    CONCLUSION

¶ 42 For the reasons set forth above, we affirm the Director's decision to deny plaintiff's request for expungement of the indicated findings of abuse and neglect against her.

¶ 43 Affirmed.

---

[5] While plaintiff does not raise it as an issue on appeal, we note that the finding as to the sexual penetration allegation is not affected by the fact that it was Wisneski, not plaintiff directly, who committed the act of sexual penetration. As noted, the Act's definition of an abused child includes a child whose parent "commits or allows to be committed any sex offense against such child," as such offenses are defined under the Criminal Code of 2012. 325 ILCS 5/3 (West 2020). An act of sexual penetration by a person over the age of 17 on a victim under age 13 is predatory criminal sexual assault of a child under the Criminal Code of 2012. 720 ILCS 5/11-1.40(a) (West 2020). Accordingly, a parent who "allows" such an offense to be committed—as plaintiff is alleged to be—may be indicated for such abuse. See 325 ILCS 5/3 (West 2020) (an indicated report means a report made under the Act if an investigation determines that credible evidence of the alleged abuse or neglect exists).